UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                                                    REPORT & RECOMMENDATION
_____
                                    Plaintiff,
                                                                    04-CR-6059T
                    v.

ANDRE GREEN,

                                    Defendant.

_____


## PRELIMINARY STATEMENT

By Order of Hon. Michael A. Telesca, United States District Judge, dated April 5,

2004, all pre-trial matters in the above-captioned case have been referred to this Court pursuant

to 28 U.S.C. § 636(b)(1)(A)-(B).  (Docket # 2).

Defendant Andre Green (hereinafter "Green") is charged in a three-count

indictment.  The first count charges Green with conspiring to possess with intent to distribute and

to distribute cocaine base, in violation of 21 U.S.C. § 846.  The second count charges Green with

possessing cocaine base with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and

841(b)(1)(A) and 18 U.S.C. § 2.  The final count charges Green with knowingly possessing

firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1) and 2.

(Docket # 1).

Currently pending before this Court for a report and recommendation is Green's motion to suppress tangible evidence.[1]  (Docket # 38).  For the following reasons, it is the recommendation of this Court that Green's motion be denied.

## FACTUAL BACKGROUND

Green moves to suppress tangible evidence that was seized from his residence pursuant to a search warrant.  In connection with this motion, this Court has reviewed the affidavit of Senior Investigator Paul H. Kelly of the New York State Police Department that was submitted in support of the search warrant at issue, as well as a written statement by a cooperating witness, Michele Smith, that was attached to Kelly's affidavit.  Finally, this Court also has conducted a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), during which the government presented the testimony of Senior Investigator Kelly.

**Affidavit by Investigator Paul Kelly:**  On September 5, 2003, law enforcement agents conducted a search of a residence located at 14 North Dansville Street, Cohocton, New York.  The search was conducted pursuant to a warrant issued by acting Steuben County Court Judge Marianne Furfure earlier that day and was based upon the affidavit of Senior Investigator Kelly.  (Docket # 38, Ex. A).  In his affidavit, Kelly affirmed that reasonable cause existed to believe that the items described in the warrant would be found at the premises to be searched.  (Docket # 38, Ex. A).  As described below, Kelly relied upon information provided by several

---

[1]  Green's omnibus motion also sought, *inter alia*, disclosure of the identity of a confidential informant, discovery and inspection, *Brady* material, *Jencks* material, rulings on evidentiary matters under rules 404, 608 and 609 of the Federal Rules of Evidence and the preservation of rough notes.  (Docket # 38).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on November 4, 2004.  (Docket # 43).

confidential informants, a cooperating witness and other law enforcement officers.  (Docket # 38, Ex. A).

Kelly's affidavit stated that during March of 2003, he, along with members of the Western Regional Community Narcotics Enforcement Team, met with Danville Chief of Police, Charles Perkins, and a confidential informant ("CI-1").  According to the affidavit, during this meeting, CI-1 indicated that s/he had a "multi-year relationship with Green that involved the possession, consumption and purchase of cocaine hydrochloride and crack cocaine."  (Docket # 38, Ex. A at 2).  CI-1 further stated that s/he knew that Green possessed, consumed and sold cocaine from his residence at 14 North Dansville Street.  CI-1 also reported that Green made weekly trips to Rochester, where he purchased varying quantities of cocaine to be transported back to his residence.  (Docket # 38, Ex. A at 2-3).

On March 14 and 19, 2003, CI-1, acting under the supervision of New York State Police Investigator Lawrence B. Jackson, entered 14 North Dansville Street and purchased cocaine from Green.  (Docket # 38, Ex. A at 3).  Approximately three weeks later, Judge Furfure authorized the installation of a pen register and trap and trace device for the telephone registered to Green at 14 North Dansville Street.  Pursuant to the order, the device was utilized from April 14, 2003 until May 22, 2003, during which sixty-three telephone calls were identified as having been received by Green's telephone from telephone number (585) 534-9783.  A records check revealed that that telephone number was registered to Michele Smith at 11148 County Road 36, Wayland, New York.  The device also revealed that Green's telephone was used to call Smith's telephone twenty-one times during the same five-week period.  (Docket # 38, Ex. A at 3).

Another informant ("CI-2") with whom Kelly was working provided information about Green and Michele Smith.  According to Kelly's affidavit, CI-2 informed the investigating agents that s/he had previously purchased crack cocaine from Green at 14 North Dansville Street, but was no longer able to do so.  She was unable to do so because Green refused to deal with her after learning that she had been arrested and fearing that she was cooperating with law enforcement.  (Docket # 38, Ex. A at 4).  CI-2 informed Kelly that s/he could instead introduce law enforcement agents to Michele Smith, who, according to CI-2, obtained her supply of crack cocaine from Green.  (Docket # 38, Ex. A at 4).

On August 4, 2003,  Kelly and New York State Police Trooper Michael S. Turton, acting in undercover capacities, met with Smith at her residence.  During that meeting, the officers negotiated the purchase of a quantity of crack cocaine.  Smith advised them that her narcotics source was unavailable at that time, and the parties agreed to meet the following day.  On August 5, 2005, Kelly and Turton again met with Smith at her residence and arranged for the purchase of crack cocaine.  After extensive negotiations, the agents provided $250 to Sally Nemitz, another woman who was present at Smith's residence, and Smith agreed to go with Nemitz to Cohocton to purchase crack cocaine.  They also agreed to meet the undercover officers at Smith's residence following the purchase in Cohocton.  (Docket # 38, Ex. A at 5).

Smith and Nemitz were thereafter observed in Nemitz's vehicle driving in the direction of Cohocton.  (Docket # 38, Ex. A at 5).  At approximately 8:49 p.m., Nemitiz's vehicle was seen by New York State Police Investigators Jackson and Christopher S. Smith entering the driveway of 14 North Dansville Street in Cohocton.  Minutes later, the females returned to the vehicle and drove away.  After waiting approximately two and one-half hours and

4

attempting without success to contact the two women, Kelly and Turton located them at 11133

Yocum Road, Cohocton.  The women stated that they had been stopped by the police and had

thrown the $250 out of the vehicle while on State Route 415.  Both women indicated that they

had not been to their source's house because of the encounter with law enforcement.  (Docket

# 38, Ex. A at 5).

On September 5, 2003, between 7:30 and 8:00 a.m., Steuben County Sheriff's

Corporal Richard Lock observed Smith's vehicle parked in the driveway of 14 North Dansville

Street.  Later that day, Smith was arrested and taken to the Wayland State Police station for

questioning.  After having been advised of her rights, Smith spoke to Investigator Jackson about

her relationship with Green and their involvement in drug transactions.  (Docket # 38, Ex. A at

5).  At approximately 2:20 p.m., Smith, under Jackson's supervision, placed a telephone call to

Green's residence.  During the call, Green questioned Smith about the phone she was using.

Smith replied that it was a "friend's."  Green then stated that he was sleeping and terminated the

call.  According to Smith, Green often used the caller-identification feature on his home

telephone to screen his calls and would not talk over the telephone unless he could identify the

caller.  (Docket # 38, Ex. A at 5).

Kelly's affidavit further detailed an additional controlled purchase of narcotics

that had occurred eight months earlier on January 29, 2003.  On that date, New York State Police

Investigator Robert J. Piskor met with Green's brother, Bernard Green, and accompanied

Bernard to 14 North Dansville Street.  While en route, Bernard advised Piskor that he frequently

stayed at 14 North Dansville Street and that if Piskor ever wanted to purchase drugs and could

not find him, he should go to that address.  Bernard further stated that if he was not at 14 North

Dansville Street, individuals at that location would know how to contact him.  Upon arriving at

14 North Dansville Street, Piskor provided Bernard with $50 in cash.  Prior to giving him the

money, Piskor expressed concern about advancing the $50.  Bernard assured him, "my blood, my

brother is in there."  Piskor then observed Bernard enter the residence.  He returned shortly

thereafter and provided Piskor with a quantity of crack cocaine.  (Docket # 38, Ex. A at 5-6).

**Statement by Michele Smith:**  Attached to Kelly's affidavit in support of the

search warrant for 14 North Dansville Street was a statement signed by Michele Smith on

September 5, 2003, the day she was arrested.  (Docket # 38, Ex. B).  In that statement, Smith

indicated that she had met Green and Green's girlfriend, Liz Snowman, at a party approximately

two years earlier.  At the party, Green shared marijuana with Smith and informed her that if she

ever wanted to buy marijuana, she could call him and he would sell it to her.  Smith stated that

she thereafter purchased "dime bags" of marijuana from Green's residence in Cohocton on a

weekly basis.  (Docket # 38, Ex. B).

According to Smith, at another party, Green asked her whether she wanted to try

crack cocaine.  Smith responded that she did, and Green removed from his pocket a small plastic

bag that contained small white rocks.  Smith paid Green $20 for the drugs, which she smoked

that night.  Green informed Smith that he could provide her with more crack cocaine.  Smith

stated that several times per week thereafter she purchased crack cocaine from Green for between

$40 and $80.  (Docket # 38, Ex. B).

Smith stated that she purchased narcotics from Green at both his residence and a

store he operated with his girlfriend in Mt. Morris.  Typically, when she arrived at his residence,

she would knock on the door and either Green, Liz or "Lucious" (Green's brother) would look

out to see who was knocking, after which Smith would be allowed into the apartment.  Smith

would provide money to the individual who answered the door and that individual then would go

into the bedroom and come back a short while later with a clear plastic bag, melted across the

top, containing crack cocaine.  Smith indicated that Green also kept the drugs outside the house

in a dog kennel because, according to her, nobody was willing to go near the pit bulls that lived

outside.  On some occasions, Smith reported, she would smoke the crack cocaine at Green's

residence, usually in the kitchen, and she also reported that she observed Green cook the power

cocaine into crack in the living room of his residence.[2]  (Docket # 38, Ex. B).

Smith further stated that Green and Liz had lived previously in "the upstairs of the

house," but that they now lived in the "downstairs."  Also, according to Smith, Green and

Snowman owned three pit-bulls, two of which were "nasty" and usually lived in a kennel or in

the basement, while the third was smaller and is "upstairs in the house all of the time."  (Docket

# 38, Ex. B).

Smith admitted that she had smoked crack cocaine at Green's residence on the

evening before her statement.  Smith stated that she had paid Green $50 and had observed him

walk into the bedroom and return with the cocaine.  Smith returned to Green's residence several

hours later and smoked more crack cocaine.  Smith believed that Green had obtained a new

supply of crack cocaine earlier in the week and that he likely had a substantial quantity remaining

because "he usually tells people if he is low."  According to Smith, Green's supply of narcotics

came from Rochester, where he generally purchased three or four eight-balls of cocaine at one

---

[2]  Smith also stated that she used the $250 that the undercover officers had given her on August 5, 2003 to purchase crack from Green, which she and Nemitz then smoked at Nemitz's house.  (Docket # 38, Ex. B).

time.  She further advised the investigating officers that she had been present when Green and

Liz returned from Rochester and had seen them with large sandwich baggies containing smaller

bags of crack cocaine packaged for sale.  She had also observed Green in possession of large

amounts of cash and had observed numerous firearms in the residence, including a sawed-off

shotgun.  (Docket # 38, Ex. B).

    **Testimony of Senior Investigator Kelly:**  Investigator Kelly testified during a

*Franks* hearing conducted before this Court on January 14, 2005.  Kelly reported that on January

29, 2003, he became involved in an investigation of suspected narcotics trafficking at 14 North

Dansville Street.  (Tr. 5).[3]  On September 5, 2003, he submitted an affidavit in support of a

search warrant for that address.  (Tr. 5).  In the affidavit, Kelly referred to 14 North Dansville

Street as a single-family residence because, in his view, "that is what it was."  (Tr. 5).  At no time

between January 2003 and September 2003 did Kelly learn of a second family living in the

residence.  (Tr. 6).  To the contrary, Kelly understood that during that time 14 North Dansville

Street was inhabited by Andre Green, Elizabeth Snowman and at least two minor children.  (Tr.

6).

        Kelly also testified that he received information that suggested to him that Green

and Snowman had access to and were using the entire residence at 14 North Dansville Street.

(Tr. 7).  Kelly referred to Michelle Smith's written statement and, specifically, that portion in

which Smith stated that one of the dogs belonging to Green and Snowman lived "upstairs in the

house all of the time."  (Tr. 8).  Kelly believed that the word "upstairs" meant the second floor of

---

[3]  The transcript of the *Franks* hearing conducted before this Court on January 14, 2005, shall hereinafter be referenced as "Tr.__."  (Docket # 54).

the residence.  (Tr. 41-42).  In addition, Kelly stated that the only vehicles the investigating

agents observed at the residence were those allegedly belonging to Green or Snowman.  In

addition, the building only bore one street number, the number fourteen.

On the day he signed the affidavit, September 5, 2003, Kelly contacted a utilities

check on 14 North Dansville Street by contacting Frontier Corporation ("Frontier").  According

to Frontier, the telephone service for 14 North Dansville Street was registered in the name of

Andre Green.  No other names were registered to that address.  (Tr. 9).  On cross-examination,

Kelly admitted that, prior to submitting his affidavit, he did not search the tax records for 14

North Dansville Street to determine whether it was listed as a single or two-family residence.

(Tr. 17).

Kelly also testified concerning the execution of the search warrant.  He stated that

he attempted to access the second floor through a hallway leading from the first floor living area

and up the stairs.  On the stairs were animal claw markings, presumedly created by the dogs, the

remnants of what appeared to be animal feces and numerous cobwebs.  At the top of the stairs

was a locked door with a window.  (Tr. 46- 47).  Kelly looked through the window and into the

second floor apartment.  According to Kelly, there did not appear to be any furniture or other

items in the apartment.  Kelly specifically testified that he neither opened the door, nor searched

the upstairs apartment.  (Tr. 48-49).  He also testified that he did not know before the search that

the upstairs portion of the house was separated from the downstairs by a locked door.  (Tr. 9).

## REPORT AND RECOMMENDATION

Green moves to suppress the tangible evidence seized from his residence on September 5, 2003.  (Docket # 38).  First, Green contends that the search warrant lacked probable cause because it was overly-broad.  According to Green, the affidavit submitted by Senior Investigator Kelly in support of the search warrant referred to 14 North Dansville Street as a single-family residence, when, in fact, it was a two-family residence, consisting of both an upstairs and downstairs apartment.  Because the affidavit and application did not identify the apartment in which the alleged narcotics trafficking activities took place, Green claims that it was overly-broad and thus lacked probable cause.  Second, Green argues that Kelly's affidavit was deliberately or recklessly false in its identification of Green's residence as a single-family residence, thus requiring suppression under to *Franks v. Delaware*, 438 U.S. 154 (1978). (Docket # 38).  These arguments are addressed in reverse order.


## I.  *Franks v. Delaware*

Green asserts that suppression of all evidence seized from his apartment is necessary because Kelly's affidavit contained deliberately or recklessly false or misleading information.  (Docket # 38).  Under the Supreme Court's holding in *Franks v. Delaware*, "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information."  *United States v. Levasseur*, 816 F. 2d 37, 43 (2d Cir. 1987) (citing *Franks v. Delaware*, 438 U.S. at 154).  Suppression is not an automatic remedy, however; rather, suppression should be denied if the false material may be separated

from the remaining content and that remaining content adequately demonstrates probable cause. *Franks* 438 U.S. at 156.

To prove falsity, the defendant must demonstrate that the affidavit submitted in support of the search warrant contained information that "the affiant knew was false or would have known was false except for his reckless disregard for the truth."  *United States v. Leon*, 468 U.S. 897, 923 (1984) (citing *Franks*, 438 U.S. at 154); *United States v. Castellanos*, 820 F. Supp. 80, 84 (S.D.N.Y. 1993).  Such proof must be by a preponderance of the evidence.  *Franks*, 438 U.S. at 156.

Here, Green alleges that Senior Investigator Kelly acted with deliberate or reckless disregard for the truth in describing 14 North Dansville Street as a single-family residence.  Kelly's description is relevant to the validity of the warrant because, generally, a search warrant for a multi-unit building must be based upon probable cause as to each subunit for which the search is authorized.  *See National City Trading Corp. v. United States*, 635 F.2d 1020, 1025 (2d Cir. 1980); *United States v. Bermudez*, 526 F.2d 89, 96-97 (2d Cir. 1975), *cert. denied*, 425 U.S. 970 (1976).

In this matter, I have reviewed Kelly's affidavit, including its attachment, as well as Kelly's testimony during the *Franks* hearing.  I find that Kelly was not reckless in his belief that 14 North Dansville Street was a single-family residence that was being used as such by Green, Snowman and their children at the time of the warrant's issuance.

Kelly testified that he referred to 14 North Dansville Street in his affidavit as a single-family residence because he believed "that is what it was" at the time of his sworn affidavit.  (Tr. 5).  He explained that his belief was based upon the information ascertained

11

through the investigation that Green, Snowman and their children were the only residents of that

address.  Consistent with that information, the only vehicles regularly observed at 14 North

Dansville Street were those belonging to Green and Snowman.  (Tr. 9).  At no time during his

approximately nine-month investigation did Kelly learn that a second family or another

individual lived at the residence.  (Tr. 6).

       Kelly further testified that the residence at 14 North Dansville Street displayed

only one street number and did not appear to bear multiple mailing addresses (for example, 14-A

and 14-B).  (Tr. 8).  Also, on the day the affidavit was submitted to Judge Furfure for review,

Kelly conducted a telephone records check that revealed Green as the only person registered for

telephone service at the residence.  (Tr. 9).  Before the search was executed, Kelly testified, he

was unaware that the building was divided into upstairs and downstairs subunits (Tr. 9),

believing instead that Green and Snowman had access to and were using the entire premises.

(Tr. 7).  That belief, Kelly explained, arose from the information provided by Michele Smith

concerning Green's and Snowman's use of the residence, as well as her information that one of

their dogs lived "upstairs" in the house.  (Tr. 41-43, Docket # 38, Ex. B).  *See United States v.*

*Santore*, 290 F.2d 51, 66 (2d Cir. 1960) (upholding search warrant that described dwelling as a

one-family residence because agents had no reason to know it was actually subdivided into two

units), *cert. denied*, 365 U.S. 834 (1961); *United States v. Maneti*, 781 F. Supp. 169, 179-80

(W.D.N.Y. 1991) ("if the building in question appears to be a single-family structure and the

investigating officers neither knew nor had reason to know of the structure's actual multiple-

occupancy character until execution of the warrant was under way, then the warrant is not

defective for failing to specify a particular subunit"); *United States v. Poppitt*, 227 F. Supp. 73,

76 (D. Del. 1964) (upholding search warrant for entire dwelling because there was "no reason to suppose that anyone other than defendant and her husband lived in the house").  Although Smith's information about the dog could have been interpreted to mean that the smaller dog lived "upstairs" from the basement (in other words, on the first floor), Kelly's alternative interpretation was reasonable and not reckless.

       To the extent Green argues that Kelly intentionally misled Judge Furfure by failing to include in his affidavit Smith's statement about Green's movement from the upstairs to the downstairs of the apartment, such argument is without merit.  Kelly attached Smith's full statement to his affidavit at the time of his application for the search warrant.  In view of that submission, and considering Kelly's testimony that he genuinely believed the residence was being used as a single-family residence, I do not find that the omission of Smith's statement from his affidavit was a deliberate attempt to mislead the issuing judge.

       Finally, I also find relevant to my determination that Kelly did not deliberately mislead the issuing court his decision not to breach the door to the second floor during the execution of the search warrant.  Kelly testified that he looked through a window into the upstairs apartment and determined that it appeared uninhabited.  (Tr. 48).  Based upon this discovery, Kelly testified that he made the investigative decision not to search that apartment.  (Tr. 48).  Although Kelly's decision not to search is not dispositive of the issue of whether the affidavit was sufficiently particular, it does dispel the suggestion that Kelly intentionally sought an overly-broad warrant for the purpose of searching the entire residence.  *United States v. Campanile*, 516 F.2d 288, 291 (2d Cir. 1975) (upholding warrant that incorrectly described apartment to be

searched as the "only basement apartment" because the defendant's apartment was the only apartment actually searched).

On the record before me, I find that Kelly did not intentionally or recklessly mislead Judge Furfure, and I thus recommend that Green's *Franks* motion be denied.

Furthermore, to the extent that Green argues that the search warrant for 14 North Dansville Street was invalid because it was overly-broad, I disagree. *See, e.g., Maryland v. Garrison*, 480 U.S. 79, 85 (1976) (subsequent discovery of facts demonstrating that a valid warrant was unnecessarily broad will not retroactively invalidate the warrant); *United States v. Maneti*, 781 F. Supp. at 179-80 (W.D.N.Y. 1991) (finding affidavit that incorrectly referred to multiple-family residence as a single-family residence was not overly-broad)*; United States v. Poppitt*, 227 F. Supp. 73, 78 (D. Del. 1964) ("The fact that the warrant was broader than it should have been had the true [fact that the residence was a multiple-family dwelling] been stated in the [] affidavit, does not invalidate the search").

I find also that the searching officers reasonably could have relied upon the validity of the warrant under *United States v. Leon*, 468 U.S. 897 (1984). *See United States v. Maneti*, 781 F. Supp. at 183 (finding *Leon* good faith exception applicable when affidavit incorrectly referred to a multiple-family dwelling as a single-family residence). After arriving at the location to be searched, the searching officers would have discovered a two-story building bearing a single mailing address. Although the building has two doors on the front facade, those doors do not appear, based upon this Court's review of the photographs of the building, obviously to lead to separate units. Rather, one door appears more prominent than the other; it is more centrally located on the facade and has a covered entranceway. (Defendant's Ex. B). The

14

other door appears consistent with a kitchen entrance or an alternative entrance to the downstairs.

Likewise, my review of the photograph depicting a staircase in the back of the house does not

lead me to conclude that the searching officers should have known that it would lead to a

separate residential unit.  (Defendant's Ex. D).  A searching officer just as reasonably could have

concluded that it was a fire escape; it does not appear to serve as a main entrance to a residential

unit.  On this record, I find that a reasonable officer reading the warrant in its entirety would have

been justified in his reliance upon it during the search.  *See United States v. Buck*, 813 F.2d 588,

593 (2d Cir. 1987) (denying motion to suppress based upon good faith exception where warrant

was deemed to have violated Fourth Amendment's particularity requirement), *cert. denied*, 484

U.S. 857 (1987); *United States v. Burke*, 718 F. Supp. 1130, 1141-42 (S.D.N.Y. 1989) (applying

good faith exception based upon finding that, *inter alia*, searching agents did not conduct a

general search despite warrant's lack of particularity).


## <u>CONCLUSION</u>

For the foregoing reasons, it is my report and recommendation that defendant's

motion to suppress tangible evidence seized from his residence **(Docket # 38)** be **DENIED**.

**IT IS SO ORDERED.**


                                                        s/Marian W. Payson
                                                        MARIAN W. PAYSON
                                                        United States Magistrate Judge


Dated: Rochester, New York
       June 24, 2005.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[4]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **<u>Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.</u>**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

s/Marian W. Payson

MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
        June 24, 2005.

---

[4] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).